■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SHLOMO HELBRANS, Appellant. [645 NYS2d 307]

The defendant, a leader of a religious group, disapproved of the secular upbringing of a 13-year-old boy and sought to raise him according to the tenets of the defendant's religious beliefs. A prime issue in the case is whether the acquiescence of the boy in the custody and indoctrination given by the defendant with the aid of the latter's religious adherents, in derogation of his parents' wishes and in full awareness of the exhaustive efforts to locate and retrieve him, exculpates the defendant from the charges of kidnapping and conspiracy. The facts as adduced at trial, which we are required to view in the light which best supports the jury's verdict, are as follows.

Shai Fhima was born in Israel on February 8, 1979. In 1989 his mother Hana and his stepfather took him and his three siblings to live in the United States. Because of abuse by Shai's stepfather, Hana took Shai and the other three children to a shelter for battered women in New Jersey. Hana was not a religious Jew, but as Shai approached his 13th birthday she wanted him to have a Bar Mitzvah. Her aunt referred her to the defendant, who was a rabbi in the Hasidic Jewish community and head of the Yeshiva Lev Tahor in Brooklyn. Shai had been raised in a secular setting, and was interested in music, dance, video games, movies, and sports. He would typically dress in jeans, sneakers, and a baseball cap.

On February 16, 1992, almost immediately after having met Shai, the defendant told Hana that there was "light in Shai's face" and that Shai was destined to become a great rabbi. The defendant's wife, Malka, told Hana that she wanted to raise Shai and tried to persuade Hana to let her do so. Over the next few days, Shai spent extensive periods of time, including overnights, at the Helbrans' home in preparation for the Bar Mitzvah, which was held on February 20, 1992. In all, less than a week passed before Shai was dressed in Hasidic garb. Shortly after the Bar Mitzvah the defendant and his wife pressed the issue further and told Hana that they had a bed for Shai. Hana relented to the extent of letting him stay at the yeshiva for what she thought was to be a short time.

After several days Hana became increasingly concerned that what she had intended as short-term instruction was becoming intense indoctrination, as Shai began to manifest what she

regarded as religious obsession. From the end of February until the abduction of Shai on April 5, 1992, the exchanges between Hana and the defendant were marked by increasingly intense confrontations regarding how Shai should be raised, and by whom. The jury heard evidence that the defendant had strongly protested Shai going to public school. The defendant rebuked Hana for living what he considered a sinful life, and told her she was raising her children sinfully. Obviously concerned that Hana and Shai were living in a shelter, he tried to convince her to bring her family into his community, and offered financial help. Each time Hana came to pick up Shai a heated confrontation would ensue; Hana wanting to take Shai, the defendant and his adherents remonstrating that Shai stay longer.

By March 15, 1992, Hana determined that she no longer wanted Shai to study at the defendant's yeshiva. She came to pick him up and to say goodbye to the defendant and his wife. Expressing their attachment to Shai, they responded with agitation, threats, and anger. The jury heard Hana's testimony as to her having told the defendant: "If I want to take my son, I don't need permission from you to take my son". The defendant replied that she was wrong, and that if she did not let her son be religious, he, the defendant, had the right to take Shai away from her. She testified that he told her that "[Y]ou not going to see good, not in this world and not in the next world, and you see that every day something bad going to happen to you. You going to be sorry for this".

At this point the defendant's wife Malka grabbed Shai's shoulder and told him that she, and not Hana, was his "mother". She then told Hana that she could not take Shai from her and the defendant, and that Hana could burst, or die, and that Hana would not see Shai anymore. Another man, a follower of the defendant, physically restrained Hana, telling her to leave, and that she could not take Shai with her. Shai bit the man's shoulder and told the man to leave his mother, Hana, alone. Shai was crying. To retrieve Shai from the defendant, Hana ran out and called the police at 911 and the boy's stepfather.

When the police arrived the defendant referred to Hana as a "dead animal", while the defendant's wife continued to exhort Shai to pay no attention to Hana, who, she said, was not his mother, but the devil. As the police escorted Shai, his mother, and his stepfather from the defendant's premises, there were more outcries from the defendant's followers urging Shai not to leave but to remember and return to his "father and

mother", the Helbrans. According to police testimony, Malka Helbrans shouted, "You can't take my son".

The days following the March 15, 1992, incident were marked by a similar pattern, in which one of the defendant's followers implored Hana to let Shai study at the yeshiva, and after yielding on one occasion, she met with resistance when she went to pick Shai up. On another occasion when with his mother, Shai received a phone call and then asked to return to the yeshiva. He ran away from home and was found at a train station in Hoboken.

On March 26, 1992, after an unremitting campaign by the defendant's followers, the defendant himself telephoned Hana. He expressed his love for Shai and his sadness at not having Shai, and again beseeched her to move into their community with Shai, who by then had largely resumed his previous habits. On April 3, 1992, Shai had even gone to a New Jersey Nets basketball game dressed in jeans, sneakers, and a baseball cap.

On the following day, Saturday, April 4, 1992, Shai traveled to his stepfather's home. That evening, Mordechai Weisz, a follower of the defendant, appeared at the stepfather's home and persuaded Hana to allow him to take Shai back to the yeshiva for a day, with the promise that she could pick him up on the following evening.

That was the last that Hana, or the authorities, would see of Shai for almost two years. The search for Shai was conducted all during that time by the Federal Bureau of Investigation, the New York City Police Department, and the New York State Police, as well as international authorities including the Royal Canadian Mounted Police and Belgian law enforcement authorities. There is no doubt that the defendant and his followers, keenly aware of the search, hid Shai at Hasidic communities including those in Monsey in Rockland County and Kasho in Westchester County, in a design to conceal Shai's whereabouts from his parents and the authorities.

The proof also established that the defendant was the pivotal figure in negotiations with Shai's biological father, Michael Reuven (who was living in Israel), relative to the production of Shai. In the course of these negotiations the defendant made a statement to Reuven that the chances of the authorities finding Shai were "extremely remote". The defendant offered to pay for Reuven's air fare to the United States to see Shai. This was to be part of a contrivance in which the defendant asked Reuven to write a letter, and to pre-date it April 1, 1992, i.e., prior to the boy's abduction, requesting that the defendant keep Shai for Reuven and away from Hana.

There was also proof presented by law enforcement agents that the defendant, in another contrivance, with the assistance of his followers, arranged to have two sets of letters emanate from Shai, for the purpose of dissuading the authorities from continuing the search. Coupled with this was proof that one of the letters was in the defendant's possession before Mordechai Weisz and another follower brought it to Federal Express to mail it.

The defendant did not testify, and we find no basis to credit his argument regarding the court's instructions pursuant to CPL 300.10 (2), which is unpreserved for appellate review.

The jury found the defendant guilty of kidnapping in the second degree (Penal Law § 135.20) and conspiracy in the fourth degree (Penal Law § 105.10 [1]) for the abduction of Shai Fhima, and he has appealed. The jury found Malka Helbrans guilty of conspiracy in the fourth degree. The trial court set aside the jury's verdict as to her and the People did not appeal. Mordechai Weisz was convicted of conspiracy in the fourth degree, upon his plea of guilty; he has not appealed.

The defendant argues, among other things, that the evidence was insufficient as a matter of law to support the kidnapping charge. He bases this argument on the contention that there was no evidence that Shai's liberty was interfered with or that Shai's freedom of movement was restricted in any way. Further, he argues that the trial court improperly undercut the defense when it instructed the jury that because Shai was under 16 years old, any acquiescence or consent on Shai's part was immaterial.

Viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt (see, People v Contes, 60 NY2d 620).

The defendant's actions, both personally and in concert with others (see, Penal Law § 20.00), meet the criteria for kidnapping in the second degree, which pursuant to Penal Law § 135.20 is synonymous with abduction. Penal Law § 135.00 (2) defines the term "abduct" as follows: " 'Abduct' means to restrain a person with intent to prevent his liberation by * * * secreting or holding him in a place where he is not likely to be found".

The evidence leaves no room for doubt that the defendant was a principal in secreting and keeping Shai in close-knit settlements where, as the defendant himself stated, Shai was not likely to be found.

The defendant's most cogent argument deals with the

concept of restraint, which is a necessary element of kidnapping in the second degree. Under Penal Law § 135.00 (1): " 'Restrain' means to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful".

The jury had ample proof to conclude that the defendant and his followers moved Shai from one place to another, secreting him from his parents and the authorities, knowing that it was unlawful.

The defendant, however, argues that these movements, and the concealment, were not done "without consent". Shai, he claims, was a runaway who sought refuge in the defendant's precincts, and was not held down, but acquiesced, free to leave the places in which he was harbored whenever he wanted to do so. The corollary of the defendant's argument is that he could not have "interfered substantially with the liberty" of someone who sought or availed himself of the very refuge that is offered by a harborer.

We disagree. Shai was 13 years old. In Penal Law § 135.00 (1) the Legislature has defined the absence of "consent" as follows: "A person is so moved or confined 'without consent' when such is accomplished by (a) physical force, intimidation or deception, or (b) any means whatever, *including acquiescence of the victim, if he is a child less than sixteen years old* or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement" (emphasis supplied).

As the Court recognized in *People v De Vyver* (89 AD2d 745), the Legislature has made it plain that the acquiescence or even the willingness of a child will not satisfy the consent element of the statute. The court did not err in instructing the jury accordingly. Moreover, we have no doubt that the Legislature intended to characterize actions such as those of the defendant as constituting a substantial interference with a person's liberty, in that a person under the age of 16 years, such as Shai, is legally incapable of consenting to such actions.

In addition, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence *(see,* CPL 470.15 [5]). The proof overwhelmingly defeats the defendant's contention that he was no more than a "passive inspirational figure" to Shai. Al-

though a witness testified that in conversation with the defendant the latter denied kidnapping Shai, the defendant revealed that he "had something to do with the fact that he disappeared". The defendant added that he believed it better to be rebellious against one's parents than to live as a secular Jew, that it was more important that Shai be religious than that he be with his family, and that it was a good deed to "take somebody that was secular and to make him a religious Jew". While in another context these statements might have been abstractions, the totality of the evidence established both the defendant's intent to secrete Shai and his actions and complicity in the actions of others in furtherance of that aim. In so doing, the defendant was acutely aware that he was acting without the consent or acquiescence—indeed in defiance—of Shai's parents. This occurred while the defendant was collaborating to throw the authorities off the track. That he may have thought he was rightfully transcending the law does not alter the fact that he intended to violate it, and did.

The defendant argues that Shai was "the willful master of his own flight" and that the kidnapping statute is not intended to cover the actions of those whom he describes as passively satisfying a child's "yearning for a serious religious life". Given the testimony before the jury, these characterizations are inapt. The proof established that the defendant cut off access from Shai's parents to their child for a prolonged period of time, during which the boy was indoctrinated with the defendant's religious beliefs. Although the defendant was acting out of his concern for Shai's well-being and out of a sense of love and attachment, the proof is that he deliberately hid Shai from his parents, frustrating the efforts of law enforcement officials who could not find the child despite a 23-month, international search.

The jury was warranted in concluding that the defendant and his followers willfully severed all parental access to Shai, with the design to prevent them from raising or even seeing the child, while keeping the parents anxious and uninformed, even as to the child's whereabouts. In all, we find no basis to disturb the conviction.

In our opinion, however, the sentence imposed was excessive to the extent indicated. Rosenblatt, J. P., Ritter, Pizzuto and Altman, JJ., concur.